# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **SARAH S. PLEZNAC**, <br><br> Plaintiff, <br><br> v. <br><br> **EQUITY RESIDENTIAL MANAGEMENT, L.L.C.**, <br><br> Defendant. | Case No. 17-cv-2732 (CRC) |

## MEMORANDUM OPINION

In September 2017, plaintiff Sarah Pleznac filed this putative class action against her former landlord, Equity Residential Management, L.L.C. The gist of Pleznac's complaint is that Equity perpetrated a "bait-and-switch" scheme that fooled her and other tenants into paying higher rents than they expected, and that it retaliated against her for complaining about its practices. Equity seeks to dismiss all of Pleznac's claims under Federal Rule of Civil Procedure 12(b)(6), contending that she has failed to adequately plead several of her claims and that others are time-barred. The Court will grant Equity's motion with respect to some of Pleznac's claims and deny it for others.

**I. Background**

Equity is an S&P 500 company that owns and manages hundreds of apartment buildings around the country, including several in the District of Columbia. Ms. Pleznac lived in one of its D.C. properties, 3003 Van Ness, from 2013 to 2017. According to Plenzac, Equity's scheme unfolded as follows: Sometime in January 2013, she saw an apartment advertised at 3003 Van Ness for $1,693 per month. Interested, Pleznac contacted Equity's rental office and applied to lease the apartment. Equity drew up a lease and told her that the District's rent-control statute

applied to the property, meaning that rent could only rise by the amount of the increase in the Consumer Price Index ("CPI") plus an additional two percentage points. Pleznac signed the lease and moved in.

But Pleznac claims that, throughout this process, Equity obfuscated that the advertised rent was heavily discounted: the lease included a so-called "rent concession" of some $1,000 per month from the "base rate." To Pleznac's apparent surprise, when her yearlong lease was set to expire, she was notified that her rent would rise by 2% over the CPI multiplied by the higher base rate—not by the lower discounted rate—resulting in a significant hike. Equity then used the threat of that higher rent—combined with the "great expense and inconvenience" of moving after just one year—to "coerce[]" her to sign several subsequent one-year leases with rents higher than she expected when she signed the initial lease. Notice of Removal Ex. A ("Compl."), ECF No. 1, ¶ 52. She alleges that Equity treated thousands of its tenants similarly.

Pleznac claims that Equity's practices violated the District of Columbia Consumer Protection Procedures Act ("CPPA"), D.C. Code § 28-3904, and amounted to a breach of contract, intentional infliction of emotional distress, and fraud. She also alleges that, when she and other tenants complained about Equity's practices, the company retaliated by filing frivolous lawsuits against them for nonpayment of rent. It would also report false information to credit reporting agencies—including that the tenant had been evicted and that she owed Equity overdue rent—and then refuse to correct those knowingly false reports after tenants contested them. In Pleznac's view, these suits against tenants amounted to malicious prosecution. And the false reports to credit agencies were both defamatory and contrary to the Fair Credit Reporting Act, a federal statute that requires entities that relay information to consumer reporting agencies to

diligently investigate disputed credit-related information and promptly correct any errors, see 15 U.S.C. § 1681s-2.

Pleznac initially filed suit in D.C. Superior Court, but Equity removed the case to federal court. The Court upheld the removal over Pleznac's objection, finding that the case was removable under the Class Action Fairness Act because it involved over 100 potential class members and put at least $5 million at issue. Op. & Order, ECF No. 19, at 4–5 (May 8, 2018). Equity has now moved to dismiss all of Pleznac's claims on various grounds pursuant to Federal Rule of Civil Procedure 12(b)(6).

## II. Legal Standard

To survive a motion to dismiss, a complaint must contain sufficient factual matter to "state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 556.

## III. Analysis

### A. CPPA and Fraud (Counts 1, 7, 8, and 9)

Equity seeks to dismiss Pleznac's CPPA and fraud claims on the basis that they are untimely. The Court agrees that dismissal of these claims is proper.

Under D.C. law, a plaintiff must bring a claim under the CPPA or for fraud within three years from the time when her right to maintain the action accrues. See D.C. Code § 12-301(8); Bradford v. George Washington University, 249 F. Supp. 3d 325, 335 (D.D.C. 2017). A claim accrues when the plaintiff has "actual notice of her cause of action." Medhin v. Hailu, 26 A.3d 307, 310 (D.C. 2011)). Pleznac admits that she had notice of Equity's allegedly deceptive

3

actions when it presented her with a notice in September 2013 showing what her rent would be if she renewed her initial lease. Equity straightforwardly contends that, because that date was more than three years before Pleznac filed her complaint in September 2017, her claims are time-barred.

Pleznac insists, however, that her claims remain viable because Equity committed a "continuing tort" against her, which included some tortious acts within the limitations period. The continuing tort doctrine allows recovery for extended harms that began outside of the applicable limitations period. Under District of Columbia law, the doctrine applies only where a plaintiff suffers "(1) a continuous and repetitious wrong, (2) with damages flowing from the act as a whole rather than from each individual act, and (3) at least one injurious act . . . within the limitation period." Beard v. Edmondson & Gallagher, 790 A.2d 541, 547–48 (D.C. 2002).

Pleznac's reliance on the continuing tort doctrine is misplaced. The doctrine applies only where the claimed "injury might not have come about *but for the entire course of conduct*." John McShain, Inc. v. L'Enfant Plaza Props., Inc., 402 A.2d 1222, 1231 n.20 (D.C. 1979) (emphasis added). For example, D.C. courts have held that certain subterranean encroachments onto someone else's land are "continuous," such that a plaintiff can seek redress for any damage caused by the encroachment within the limitations period even if he first became aware of the encroachment outside of the limitations period. L'Enfant Plaza East, Inc. v. John McShain, Inc., 359 A.2d 5, 6 (D.C. 1976). But that sort of case is a rare exception to the general rule that, when a plaintiff suffers an identifiable legal wrong and experiences "[a]ny appreciable and actual harm flowing from the [defendant's] conduct," her claim accrues at that moment. Beard, 790 A.2d at 546 (alterations in original) (quoting Hendel v. World Plan Exec. Council, 705 A.2d 656, 661 (D.C. 1997)). The fact that an *injury* continues into the limitations period—or even that new and

4

unexpected injuries arise—does not allow her to sue for the initial wrong that occurred outside the limitations period. This is why the D.C. Court of Appeals has held that claims based on alleged sexual abuse accrue when a plaintiff is first aware of the fact of abuse, not when he later "appreciated the full impact of [the alleged] misconduct." See Cevenini v. Archbishop of Wash., 707 A.2d 768, 772 (D.C. 1998). And why it has explained that medical malpractice claims ripen when a plaintiff first becomes aware of cancer caused by a doctor's alleged negligence, not when the cancer later metastasizes and creates more catastrophic harm. Colbert v. Georgetown Univ., 641 A.2d 469, 475–76 (D.C. 1994) (en banc).

In other words, the continuing tort doctrine does not mean "that accrual should be tolled until the plaintiff fully appreciates the 'impact' of the harm directed at him." Cevenini, 707 A.2d at 772. Rather, "once the plaintiff has been placed on notice of an injury and the role of the defendants' wrongful conduct in causing it, the policy disfavoring stale claims makes application of the 'continuous tort' doctrine inappropriate." Hendel, 705 A.2d at 667.

All of this is to say that the doctrine is inapplicable to Pleznac's CPPA and fraud claims. There is no way to read her complaint as alleging harm that materialized *only* through Equity's course of conduct as a whole. Quite the contrary, the nature of her claims show that she seeks redress for discrete, identifiable instances of alleged deception with continuing consequences. See Wallace v. Skadden, Arps, Meagher & Flom, 715 A.2d 873, 882 (D.C. 1998) (rejecting that multiple "defamatory statements were all part of a single continuing course of conduct," even where plaintiff alleged that the statements "cumulatively led to her discharge from employment"). Specifically, Pleznac claims that Equity violated the CPPA by:

- misrepresenting or failing to state a material fact—*i.e.*, the actual rent being charged;
- advertising or offering apartments without the intent to sell them as advertised;

5

- making a misleading representation concerning the reasons for its price reductions or the price in comparison to its own price at a past or future time;

- falsely stating the reasons for offering or supplying the rent discount; and

- making or enforcing unconscionable lease terms.

Compl. ¶ 73. Similarly, Pleznac's fraud claims rest on allegations that Equity fraudulently induced her into signing a lease (Count 7); fraudulently concealed the actual, pre-concession rent (Count 8); and fraudulently misrepresented how the District's rent-control statute would apply to her lease (Count 9).

Thus, under Pleznac's own legal theories, Equity violated the law when it advertised the apartment with its lower, post-concession rent and when it misled her about the application of the rent-control statute. What followed was not a series of "injurious act[s]" for purposes of the continuing tort doctrine, but rather *notice* of the purported deception (through the September 2013 renewal notice) and *subsequent injuries* attributable to being "trapped" by the initial deception, Compl. ¶ 2.

On the latter point, Pleznac urges that after receiving the 2013 renewal notice, she agreed to renew her lease for several yearlong terms, and that some renewals occurred within the limitations period. She contends that the high transaction costs of moving, combined with Equity's threat of increasing her rent based on the pre-concession price, forced her to do so. In her view, each renewal therefore makes up part of an ongoing injury. But her own arguments belie this characterization. She explains that "the initial deception involving the first rent concession *begins the cycle* of trapping victims, and the cycle is perpetuated *by each subsequent renewal lease*." Pl.'s Opp'n Mot. Dismiss at 8 (emphasis added). In other words, Pleznac admits that she viewed each renewal as causing "appreciable" harm stemming from the initial

6

deception. And because she first renewed her lease in January 2014—over three years before she filed suit— her claims based on any initial deception are necessarily untimely.[1]

To be sure, even though Pleznac's claims do not come within the continuing tort rule, that does not necessarily mean that she is barred from seeking relief based on the subsequent lease renewals. It could theoretically be the case that the renewals were independent acts of deception rather than mere injuries flowing from the initial misrepresentations or omissions. See, e.g., Kyriakopoulos v. George Wash. Univ., 866 F.2d 438, 447 (D.C. Cir. 1989) ("If . . . a university committee of five members considers a professor's application and issues a report libeling him, and subsequently does so again as part of a grievance proceeding several years later, the later actions are actionable even though they constitute a repetition of the earlier contract breach and libel."). But Pleznac nowhere alleges that these subsequent renewals were *themselves* deceptive or fraudulent. (It is indeed hard to see how any renewals after January 2014 could be characterized as *deceptive*, given that Pleznac admits she was fully aware of Equity's approach to calculating rent increases by September 2013.)

At bottom, because Pleznac admits learning of the alleged deception and experiencing some resulting injury over three years before filing her complaint, she cannot recover for that deception under the CPPA or through claims for fraud.[2] Beard, 790 A.2d at 548. The Court

---

[1] The logical conclusion of Pleznac's argument helps show why it must be rejected. What if Pleznac had signed a lease with rent concessions 30 years ago and, a year later, was presented with a notice showing that her rent was going to double? Suppose she then reluctantly signed yearlong leases for the next 30 years, aware that she had been deceived but feeling trapped from moving out. Could she bring a fraud claim today based on the decades-old deception simply because she had renewed her lease within the past three years? Under her theory of continuing torts, the answer would be yes. That cannot be the law.

[2] Pleznac points out that she seeks to represent a class of tenants who were deceived by the alleged scheme within three years before she filed suit. She contends that, by definition,

7

need not rule on Equity's alternative asserted basis for dismissing Pleznac's CPPA claim: that her claim arises out of "landlord-tenant relations" and is therefore categorically outside the scope of the CPPA. See D.C. Code § 28-3903(c)(2)(a).

B. Fair Credit Reporting Act (Count 2)

Equity contends that Pleznac failed to adequately plead one element of her claim under the Fair Credit Reporting Act ("FCRA"). The Court disagrees.

Pleznac seeks relief under § 1681s-2(b) of the FCRA, which requires parties who furnish credit information to reporting agencies to investigate disputed credit information and to correct any inaccuracies. 15 U.S.C. § 1681s-2(b)(1); see also id. § 1681n (creating private right of action against furnishers of information). To prevail on a claim against a furnisher under § 1681s-2(b), a plaintiff must show both that (1) she notified the reporting agency (here, Transunion) of the disputed credit information and that (2) the agency in turn provided notice to the of the dispute to the furnisher (here, Equity). See 15 U.S.C. § 1681i(a); Phrasavang v. Deutsche Bank, 656 F. Supp. 2d 196, 203 (D.D.C. 2009).

Equity agrees that Pleznac adequately pled the first of these requirements. She claims to have contacted Transunion in March 2017 to dispute the accuracy of her credit information. Compl. ¶ 81. But Equity contends that her allegation of the second element is too cursory to survive a motion to dismiss. Not so. Pleznac alleges based "on information and belief" that

---

some of these class members were harmed within the three-year limitations period. But if a plaintiff's claim is time-barred, the fact that she seeks to represent a class of in-time claims cannot can save her. See E. Texas Motor Freight Sys. Inc. v. Rodriguez, 431 U.S. 395, 403 (1977) ("[A] class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." (quoting Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. 208, 216 (1974))). To take an obvious example: a plaintiff who claimed to have been duped 20 years ago could not bring a putative class action on the ground that some people subjected to similar deception were injured within the limitations period.

8

Transunion provided notice of the disputed information to Equity. Compl. ¶ 82. At least one court in this district has held that, where a plaintiff plausibly alleges that they notified a reporting agency of a dispute, the plaintiff need not allege with particularity that the reporting agency in turn notified the furnisher. Rather, that court explained—and this one agrees—that one can infer the reporting agency's compliance with its statutory duty to notify the furnisher, 15 U.S.C. § 1681i(a)(2). See Himmelstein v. Comcast of the District, L.L.C., 931 F. Supp. 2d 48, 55 (D.D.C. 2013) ("While Defendant may certainly introduce evidence at summary judgment that shows such notice did not actually occur, at this stage the Court is bound to grant Plaintiff the presumption that the credit bureaus complied with the FCRA and in fact notified [Defendant] of the disputed debt."). Pleznac's FCRA claim survives Equity's motion to dismiss.

C. Defamation (Count 3)

Equity next argues that Pleznac's common law defamation claim is preempted by the FCRA. That is correct. The FCRA expressly preempts all state law claims "with respect to any subject matter regulated under . . . section 1681s-2 . . . relating to the responsibilities of persons who furnish information to consumer reporting agencies." 15 U.S.C. § 1681t(b)(1)(F). In other words, "claims made under state law concerning the furnishing and correcting of information to credit reporting agencies are preempted by FCRA." Ihebereme v. Capital One, 933 F. Supp. 2d 86, 98 (D.D.C. 2013).

Pleznac's claim for defamation falls squarely within the FCRA's preemption provision. All of Equity's allegedly defamatory statements were reports of credit-related information. Compl. ¶ 93 ("credit reports . . . which stated that Plaintiff had been evicted"); id. at 96 (statements about Pleznac "owing rent arrears"). It is precisely those reports, and the failure to correct them, that Pleznac claims violated the FCRA. Id. ¶ 83 ("Defendant failed to conduct a

9

reasonable investigation into the accuracy of information it reported about Plaintiff relative to unpaid rents which were not owed . . . and to an eviction which did not happen"). Her defamation claim is therefore preempted and must be dismissed.

    D. <u>Malicious Prosecution (Count 4)</u>

Next, Equity seeks to dismiss Pleznac's claim for malicious prosecution on the ground that she did not adequately plead one element of her claim—that of "special injury" resulting from the defendant's legal action. <u>Pitt v. District of Columbia</u>, 491 F.3d 494, 501 (D.C. Cir. 2007). This argument falls flat.

To establish a claim of malicious prosecution under D.C. law, a plaintiff must plead: "(1) that the underlying suit terminated in plaintiff's favor; (2) malice on the part of the defendant; (3) lack of probable cause for the underlying suit; and (4) special injury occasioned by the plaintiff as a result of the original action." <u>Morowitz v. Marvel</u>, 423 A.2d 196, 198 (D.C. 1980). "Special injury" means something more than would "necessarily result from suits to recover for like causes of action." <u>Havilah Real Property Services, LLC v. VLK, LLC</u>, 108 A.3d 334, 354 (D.C. 2015). D.C. courts have "repeatedly held" that "injuries to reputation, emotional distress, loss of income, and substantial expense in defending are outside the scope of what constitutes a 'special injury.'" <u>Id.</u>; see also <u>Mazanderan v. McGranery</u>, 490 A.2d 180, 182 (D.C. 1984); <u>Epps v. Vogel</u>, 454 A.2d 20, 324 (D.C. 1982).

Under these standards, Pleznac's claim would not likely survive if she identified only one wrongful suit. But under D.C. law, *consecutive* suits brought "maliciously" and "without just cause and in bad faith" *categorically* count as "special injury." <u>Soffos v. Eaton</u>, 152 F.2d 682 (D.C. Cir. 1945). This longstanding rule originated in <u>Soffos</u>, where the D.C. Circuit held that a plaintiff adequately pleaded special injury by alleging that her landlord had filed four

10

consecutive bad-faith suits against her. 152 F.2d at 682. The court explained that "[t]he burden of being compelled to defend successive unconscionable suits is not one which would 'necessarily result in all suits prosecuted to recover for like causes of action." Id. at 683. As a result, "one who twice sues another maliciously and without probable cause is responsible to him in damages." Id. D.C. courts read Soffos to stand for a categorical rule: two or more successive malicious suits without probable cause create special injury. See, e.g., Nolan v. Allstate Home Equip. Co., 149 A.2d 426, 429 n.6 (D.C. 1959) ("An exception to th[e] [special injury] rule has been made in the District of Columbia to allow a recovery for the repeated institution of groundless suits.").

That rule applies here.[3] Pleznac claims that her special injury was defending against "multiple baseless lawsuits," which resulted in "economic damages and emotional distress." Compl. ¶ 114. The first suit, Pleznac says, sought requested rent arrears that Equity "knew were not owed per [the parties'] settlement agreement." Compl. ¶ 60. After dismissing that suit, Equity purportedly filed another one seeking the same rent arrears. Id. ¶ 61. Equity dismissed that suit and later filed (and dismissed) yet another seeking the same arrears. Id. ¶ 62–63. According to Pleznac, Equity dismissed each of these suits only after she had incurred costs to begin defending herself. Pleznac's allegations about these three suits are sufficient to plead special damages.[4]

---

[3] Pleznac in her opposition clearly explains that she is relying on Soffos in claiming special injury. In reply, Equity does not even acknowledge its well-established rule, and thus effectively concedes that Pleznac adequately pled special damages.

[4] Equity suggests that at least "parts of" Pleznac's malicious prosecution claim are untimely because such claims are subject to a one-year limitations period, D.C. Code § 12-301(4), and the first and second suits were dismissed over a year before Pleznac filed this action. To the extent that Pleznac seeks relief based on each suit individually, the Court agrees that she cannot recover for the first two. But particularly in light of Soffos, the Court thinks it fair to read

11

E. Breach of Contract (Count 5)

Equity contends that Pleznac's allegations are too "skeletal" to support a breach-of-contract claim. Def.'s Reply at 11. This argument is baseless. Pleznac alleges (1) she and Equity previously entered a settlement agreement following "extensive litigation and a successful mediation," Compl. ¶ 58, and that Equity's suits for rent arrears were expressly barred by that agreement, id. ¶ 60 (quoting settlement provision stating that "Tenant, upon execution of this Agreement by the parties hereto, shall be deemed by landlord to be current in her rent"). These allegations easily survive a motion to dismiss. See Burnett v. American Federation of Government Employees, 102 F.Supp.3d 183, 193 (D.D.C. 2015) (denying defendant's motion to dismiss because "complaint sufficiently alleges the existence of a contract, its general terms, and the contractual obligation that Defendant purportedly violated").

F. Intentional Infliction of Emotional Distress (Count 6)

Equity also seeks to dismiss Pleznac's claim for intentional infliction of emotional distress ("IIED"), contending that she has not adequately pled its elements. The Court disagrees.

"To succeed on a claim of intentional infliction of emotional distress, a plaintiff must show (1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress." Armstrong v. Thompson, 80 A.3d 177, 189 (D.C. 2013). Given the difficulty of proving IIED under D.C. law, see Bernstein v. Fernandez, 649 A.2d 1064, 1075 n.17 (D.C. 1991), the Court has doubts about the ultimate merits of Pleznac's claim. She would need to show that Equity's conduct was "so outrageous in

---

Pleznac's complaint as alleging that the third of these suits—which Equity dropped within the limitations period—amounted to malicious prosecution, with the prior two suits being necessary predicates of her allegation of special damages.

12

character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community," and that she that she experienced emotional distress "of so acute a nature that harmful physical consequences might be not unlikely to result." Sere v. Group Hospitalization, Inc., 443 A.2d 33, 37 (D.C. 1982) (internal quotations omitted).

But at this stage of the litigation, Pleznac must only allege facts that, if borne out through discovery, would support findings on those elements. She has done so. In addition to describing Equity's alleged scheme and its retaliatory lawsuits against her, Pleznac alleges that the company "further retaliated against [her] by failing to provide services, including refusing to make repairs to her unit, and repeatedly sending her account statements claiming rents in excess of the lease and allowed late charges . . . and otherwise harassing [her] and making it known she was being targeted for mistreatment by . . . staff in the building." Compl. ¶ 66. She also purports that Equity's course of conduct caused her "extreme mental distress." Id. ¶ 118. Taken together, her allegations, though lacking certain detail, are enough to survive a motion to dismiss. See Jonathan Woodner Co. v. Breeden, 665 A.2d 929, 935 (D.C. 1995) (explaining that, while "bad conditions alone are not sufficient," evidence of landlord's harassment and intimidation supported a jury verdict for tenants on their IIED claim).

### G. Punitive Damages (Count 10)

Finally, Equity claims that Count 10 of the complaint—titled "Punitive Damages"—must be dismissed because there is no such thing as a *claim* for "punitive damages." See Iacangelo v. Georgetown Univ., 580 F.Supp.2d 111, 117 (D.D.C. 2008) ("A claim for punitive damages is a 'disfavored remedy, not a freestanding claim.'" (quoting Parker v. Stein, 557 A.2d 1319, 1322 (D.C. 1989))). Pleznac accepts this principle, but explains that she intended Count 10 only as a

13

request for punitive damages as a remedy for her intentional-tort claims. Without opining on the availability of punitive damages in this case, Count 10 is dismissed insofar as it appears as a separate claim.

## IV. Conclusion

Equity's motion to dismiss is therefore granted with respect to Pleznac's claims under the CPPA (Count 1) and for defamation (Count 3), fraud (Counts 7–9), and punitive damages (Count 10). Equity's motion is denied with respect to her claims under the Fair Credit Reporting Act (Count 2) and for breach of contract (Count 4), malicious prosecution (Count 5), and intentional infliction of emotional distress (Count 6). A separate order accompanies this memorandum opinion.

CHRISTOPHER R. COOPER
United States District Judge

Date: August 8, 2018